## THE MAGGIE.

## THE PICKETT.

(Circuit Court of Appeals, Second Circuit. February 6, 1917.)

### No. 79.

COLLISION ☞71(2)—TOW PASSING DREDGE—NEGLIGENT NAVIGATION OF TUG.
    A collision occurred at night in Arthur Kill between two of the starboard boats in a tow of 19 coal boats in five tiers and a scow alongside of a dredge working under a government contract in the middle of the channel. Both the dredge and scow were fully lighted, and there was sufficient room on the side taken by the tow for safe passage with proper navigation. The tug gave no notice of a desire to have the scow moved until within 200 feet, when there was not time to move it. *Held*, that, in the absence of timely notice, the dredge was not in fault for not moving the scow, and that the tug was solely in fault for the collision.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by Abraham Silver, assignee of the Bowns-Pattison Transportation Company, owner of the boat Maggie, and of W. H. Follette, owner of the boat Pickett, against the Morris & Cummings Dredging Company, with the Lehigh Valley Transportation Company, owner of the tug Mahanoy, impleaded. Decree for libelant against both respondents, and the Morris & Cummings Dredging Company appeals. Modified.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Everett, Clarke & Benedict, of New York City (A. Leo Everett and Herman S. Hertwig, both of New York City, of counsel), for appellant.

Allan B. A. Bradley, of New York City, for appellee Silver.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for appellee Lehigh Valley Transp. Co.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. A decree has been entered in the court below awarding to the libelant the sum of $2,282.28 as damages to the coal boats Maggie and Pickett, which damages were sustained in a collision, and dividing the damages equally between the appellant, found in fault, and the Lehigh Valley Transportation Company, the owner of the tug, Mahanoy, also found in fault. The Lehigh Transportation Company was brought in by the appellant under rule 59 (29 Sup. Ct. xxxii).

The collision occurred in Arthur Kill, in the vicinity of Holland Hook. During the night of January 24, 1914, the tug Mahanoy, with the boats Maggie and Pickett and 17 other loaded coal boats in tow, was proceeding from Perth Amboy, N. J., to New York. The tow was made up in five tiers; the first four tiers consisted of four boats each, and the last tier of three boats. The Maggie was the starboard boat in the first tier, and the Pickett the starboard boat in the second tier. The tug was towing on two hawsers about 150 or 200 feet long; the hawsers running from the stern bitts of the tug to the bitts of the outside boats in the first tier. The distance between the tiers in the tow was about 6 feet. The lights of the tug and her tow were properly set and burning. While the tug was proceeding up Arthur Kill, the master saw the lights of a dredge, which was anchored in the middle of the channel off Holland Hook. The weather was clear, there was little or no wind, and the tide was flood. As the tug proceeded, her master also observed that there were a number of loaded mud scows lying two abreast alongside of the Pipe Dock at Elizabethport, N. J. The dredge was lying off the Pipe Rock about in the middle of the channel. The tug Allentown, which was assisting the tug Mahanoy, was at the stern of the tow for the purpose of preventing the tow from swinging against the Elizabethport docks or the boats lying alongside of them. The master of the Mahanoy proceeded to pass the dredge on the New Jersey side. The channel through which the Mahanoy and her tow had to pass was restricted by the presence of the dredge and the additional obstruction offered by the scow alongside of the dredge. The tug continued on, and while proceeding between the scow lying alongside the dredge and Elizabethport, the boat Maggie, the starboard boat in the first tier of the tow, came into collision with the scow, doing considerable damage to the Maggie, and also damaging the boat Pickett, immediately behind the Maggie.

The appellant was engaged in the work of widening and deepening the channel of Staten Island Sound between Elizabethport and the Baltimore & Ohio bridge, under a contract with the United States government, and it was duly permitted under its contract and by au-

thorization of the proper government engineer to work by night as well as by day. In doing said work it necessarily placed its dredge in the channel of the stream and worked with scows to receive the dredged material. On the night of January 24, 1914, its dredge was properly lighted, and we are satisfied that the scow alongside of the dredge was lighted. The secretary of the appellant company testified as to the lights as follows:

"Q. Do you know what light equipment there was on your dredge? A. The dredge was equipped with arc lights that are as brilliant by reason of the number of them, and the kind, as it is at Forty-Second street at night. Q. Describe a little more in detail what they are and where they are situated. A. The arc lights are made fast to different parts of the A-frame of the dredge, and the other parts of the house, so that the waters for at least 100 feet on a dark night are illuminated. Q. And with reference to the scow on the Jersey side, would there be any illumination of that side of the dredge under the conditions of lighting which you describe? A. The scow alongside of the dredge would be illuminated by the lights of the dredge. Q. Did these dredge lights have shades to them, reflectors? A. No; they have not. Q. Are they arc lights, or incandescent lights? A. They are the usual arc lights; I should say that at the time there were about 17."

An inspector in the employ of the United States government, who was on the dredge at the time of the accident, testified as follows:

"Q. In respect to lights, what, if anything, did you see about the lights? A. The lights were all in good order. Q. What lights were there? A. The dredge was thoroughly lighted, and the scow was lighted. Q. Did she have more than one light? A. One in the bow and one on the stern. Q. How were they fastened? What supports? A. An iron rod, and a lantern hung to a hook in the top of the iron rod."

A witness, who was in charge of the dredge when the accident happened, testified as follows:

"Q. Did you have any light on the scow? A. Yes, sir. Q. What sort of light on the scow? A. Two lanterns, one on each end, about 6 or 7 feet from the deck. Q. If there had been no lights at all, would she have been lighted up at all in any other way? A. Yes, sir. Q. How could you have seen her, if she had had no lights? A. See her 6,000 or 7,000 feet on a clear night. Q. From the lights of the dredge, you mean? A. Yes, sir."

The Staten Island Sound is a narrow channel at the place of the collision and the full tide runs with considerable force and vessels passing through the channel are bound to operate with care and caution and to take into account the presence of all known obstructions. On the night of the collision the dredge was not working in the middle of the channel, and there was room for a properly made up tow to pass in safety between the dredge and the New Jersey shore. That the tug was in fault is clear to us, as it was to the court below. The pilot in charge of the tug at the time testifies that he was keeping a good lookout and saw the dredge a mile or a mile and a half away, but did not see the scow until within 200 feet of it. Careful navigation would have enabled him to have safely passed the dredge and scow. The channel was 400 feet wide at the point where the collision occurred. The dredge was in the middle of the channel. The dredge was 45 feet wide and the mud scow alongside was 35 feet wide, and

the width of the tow was about 100 feet. The superintendent of the floating equipment of the Lehigh Valley Transportation Company was asked on cross-examination whether he thought the pilot of the Mahanoy was bound to hit the scow, and he replied:.

"I don't think he was bound to hit it; I think the conditions were such that he could have avoided hitting it."

And the pilot of the Mahanoy was asked, if he had gone 2 feet more to the west, whether he would not have cleared the scow, and he said: "I guess it would." And he was asked whether, having discovered the scow when he was 200 feet away, the distance was sufficient to enable him to adjust his course for the purpose of avoiding the scow. To this he testified, "Yes." And as the Lehigh Valley Transportation Company has taken no appeal it may be assumed that it is conceded that the tug was at fault.

The question with which we are now concerned is whether the appellant, the Dredging Company, was also at fault. We think the court below was in error in holding it in fault. The only ground of liability as against the dredge is that the scow was an obstruction to navigation and was not moved, when it should have been. It is certain that, if the scow had not been there, the collision would not have occurred. The contract which the dredging company had with the government required in express terms that the contractor should conduct the work in such a manner as to obstruct navigation as little as possible. It was also provided that, in case the contractor's plant so obstructed the channel as to impede the passage of vessels, it should promptly be so moved as to afford a practicable passage on the approach of any vessel. Those in charge of the dredge admit they saw the tug when she was about 3,000 feet away, and it appears that the tug and the tow were properly lighted. It also appears that the scow could have been moved in from 5 to 10 minutes. It appears, too, that when the scow was discovered by the latter the tug blew alarm whistles, but that was when the tug was within 200 feet of the scow.

It is our opinion, however, that those on the dredge had a right to presume, as the tug had given no notice to the contrary until she was within 200 feet of the dredge, that the approaching tug thought there was sufficient room for handling her tow. When she finally gave the alarm, there was then no sufficient time to move the scow. In The Wyomissing, 232 Fed. 453, 146 C. C. A. 447, we held that tugs navigating long tows in the tidewaters in the vicinity of New York, and desiring dredges engaged in government work to move themselves or the scows in order to give them room for safer passage, should give timely notice to that effect. Unless such timely notice is given, the dredge is justified in remaining where it is and in not moving the scow. As no such timely notice was given in the case at bar, we cannot hold the Dredging Company at fault. The dredge was properly lighted, and so was the scow, and the pilot on the tug had no excuse for not seeing them and navigating accordingly.

The decree apportioning the damages equally must be modified, and the entire damages, with interest and costs, must be entered against the

Lehigh Valley Transportation Company, and the libel dismissed, with costs, as to the Morris & Cummings Dredging Company.

It is so ordered.